Belknap,
Feb. 3, 1953. } No. 4174.

STATE *v.* VICTOR DYER.

*William W. Keller,* former county solicitor, and *Thomas P. Cheney,* county solicitor (*Mr. Cheney* orally), for the State.

*Thomas J. McIntyre* for the defendant.

BLANDIN, J.   The questions before us are first, whether under the circumstances disclosed by the agreed facts, it can be found that the defendant committed an offense under R. L., c. 440, s. 2, and second, if so, does the statute offend the constitutional free speech provisions.   Section 2 reads as follows:   "No person shall address any offensive, derisive, or annoying word to any other person who is lawfully in any street or public place, nor deride, offend, or annoy him, or prevent him from pursuing his lawful business or occupation."   Our court has decided that the object of this provision is to preserve the public peace and that it contravenes neither the state nor federal Constitutions. *State* v. *Chaplinsky,* 91 N. H. 310.   The Supreme Court of the United States has held that so construed section 2 is constitutional.   *Chaplinsky* v. *New Hampshire,* 315 U. S. 568.

The question therefore resolves itself as to whether reasonable persons can find in the circumstances here that the words used by the defendant were "offensive, derisive, or annoying" words, likely to provoke retaliation. *Chaplinsky* v. *New Hampshire, supra,* 574. In order to decide this, it seems advisable to refer in some detail to the agreed facts since "The interest in protecting speech depends on the circumstances of the occasion." *Dennis* v. *United States,* 341 U. S. 494, 544.   A strike had been on at the Scott & Williams plant where the complainants worked for about three weeks.   Dur-

ing this strike the defendant, a union official, had been very active and there had been much picketing. Both complainants who were old employees of the company had chosen to stay on the job, although Powell had been out with the strikers for the first two weeks. Altogether the situation might be found to be one to raise tempers and lower self control. Clearly the epithets "scab" and "scabby French" yelled by a comparative stranger at the respective complainants who with their wives, were lawfully and peaceably driving along a public road, at some distance from the plant and not on their way to and from work, were not terms of endearment or flattery. Under the circumstances here a court or jury could believe they were not at all likely to peacefully persuade these men to change their views. It could also be found the real objective of free speech had been submerged in a flood of anger and contempt, which, however natural, could serve no lawful purpose on this occasion. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument [the federal Constitution]." *State v. Chaplinsky*, 91 N. H. 310, 320, and authorities cited. The defendant in argument naturally places all stress on his rights, ignoring the interest of the State in preserving the peace, and the rights of the complainants. However, "Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses. *Rights other than those of the advocates are involved.* By adjustment of rights, we can have both full liberty of expression and an orderly life." *Breard* v. *Alexandria*, 341 U. S. 622, 642; 342 U. S. 843. (Emphasis supplied). We believe this must be so since liberty exercised without responsibility to others becomes license. In short, it could be found that the epithets spoken by the defendant were not instruments of information nor peaceful persuasion, but were offensive, derisive and annoying words, likely in the setting here to provoke retaliation. It follows that a conviction for using them would not be contrary to the state or federal Constitutions. *State* v. *Chaplinsky*, 91 N. H. 310; *Chaplinsky* v. *New Hampshire*, 315 U. S. 568.

It is also argued that since the parties concerned were all workmen involved in a strike where rough talk is often made, the words could not be found offensive. We believe such a concept does small credit to the sensibilities of workers and less to our principle of equal justice to all under law. The language of angry, revengeful

or excited men in any walk of life often bears little resemblance to proper parlor conversation, and as often tends to provoke violence. The purpose of the statute was to prevent just this and its protection extends to all, including persons involved in strikes. The notion that one has rights without corresponding duties would destroy our scheme of ordered liberty under law, since real freedom and responsibility must go hand in hand. To separate them is to destroy both. It follows the order is

*Exceptions overruled.*

All concurred.